[No. B019707. Second Dist., Div. Five. Oct. 30, 1986.]

NICK TROY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ROBERT A. ROURKE et al., Real Parties in Interest.

**COUNSEL**

Stanley H. Getz for Petitioner.

No appearance for Respondent.

David L. Ray and Byron Z. Moldo for Real Parties in Interest.

## Opinion

**ASHBY, Acting P. J.**—Petitioner Nick Troy seeks to restrain enforcement of an order re contempt, entered after Troy, citing his Fifth Amendment privilege against self-incrimination, refused to answer questions propounded to him at a judgment debtor examination. Troy also raises objections to some of the questions based upon relevance and assertion of the marital privilege (Evid. Code, §§ 970, 980). We initially denied Troy's petition for writ of mandate,[1] but thereafter issued an order to show cause at the direction of the Supreme Court. Once again, we deny the petition.

### Facts

In April 1980, Troy and several associates were indicted by a federal grand jury on charges of conspiracy and mail fraud in connection with a multimillion dollar land fraud scheme. The indictment alleged that Troy and others, through their company Pre-Builder Land Corp. (PBL) and other entities, placed advertisements in newspapers throughout the United States and in foreign countries, offering for sale land which, unknown to the victims, was owned by various shell corporations controlled by Troy and his associates. PBL made available for sale to its "investors" land which was represented to be "in the path of development,"[2] and could later be sold to developers at a large profit. PBL allegedly represented to potential investors that it was only a broker and made a commission only from the investor's later sale of land to developer, not from the investor's purchase of the land. In fact, Troy and the other principals of PBL directly profited from the sale of land to investors by virtue of the fact that PBL had purchased the land and used various shell corporations to grossly inflate the price of the land before reselling it to the investors.

In December 1980, Troy was convicted of conspiracy and mail fraud with respect to six counts of the forty-two count indictment, and was sentenced to three years in federal prison. Troy began serving his sentence on July 6, 1982, and was released on July 18, 1984, at which time he began a three-year period of formal probation.

A number of PBL's victims had filed civil suits and obtained money judgments against Troy. At the request of plaintiffs (real parties herein), the superior court appointed a receiver, David Ray, to collect funds which

---

[1]Although the petition is denominated a petition for writ of mandate, the appropriate remedy is in the nature of prohibition. (*Cohen* v. *Superior Court* (1959) 173 Cal.App.2d 61 [343 P.2d 286].)

[2]The grand jury indictment alleged that in one instance, the land was "located on flood plains," and "was in the path only of water."

could be used to satisfy the judgments. On June 17, 1985, Ray obtained a court order directing that Troy appear to answer questions at a judgment debtor examination. The present controversy ensued.

After a number of continuances, the judgment debtor examination finally took place on October 21, 1985. Prior to the examination, Troy indicated that he would assert his Fifth Amendment privilege against self-incrimination as to any question which would be propounded at the judgment debtor examination. The court, after hearing extensive argument from counsel, ruled that Troy had not met his burden of establishing that "answers in response to questions at a judgment debtor examination would tend to incriminate him in any way." The judgment debtor examination commenced, and Troy responded "Fifth Amendment" to each of the 234 questions asked. The court ordered Troy to answer the questions and Troy indicated that he would continue to assert his Fifth Amendment privilege. The court then announced its intention to hold Troy in contempt of court, but gave Troy an extension of time to seek appellate relief.

On November 26, 1985, Troy's petition for writ of mandate (No. B017321) was denied by this court, and on January 30, 1986, his petition for review was denied by the Supreme Court "without prejudice as to filing an appropriate petition after a final judgment of contempt has been entered."

After overruling Troy's further objections to certain questions, the court, on March 26, 1986, issued its findings and order re contempt, once again granting Troy a stay to seek appellate relief. Troy filed the within petition and application for temporary stay, which we denied on April 10, 1986. The Supreme Court thereafter issued a stay of execution of the order re contempt, and directed this court to issue an order to show cause why the relief prayed for in the petition should not be granted.

We conclude that Troy may not assert a Fifth Amendment privilege in the pending judgment debtor proceeding and that his other objections to various questions are without merit.

### DISCUSSION

1. *The Fifth Amendment Privilege.* The privilege against self-incrimination applies in judgment debtor proceedings. (*Coleman* v. *Galvin* (1947) 78 Cal.App.2d 313 [177 P.2d 606].) However, the privilege may not be asserted by merely declaring that an answer will incriminate (*Baker* v. *Limber* (9th Cir. 1981) 647 F.2d 912, 916); it must be "evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be

answered might be dangerous because injurious disclosure could result." (*Brunswick Corp.* v. *Doff* (9th Cir. 1981) 638 F.2d 108, 110, citing *Hoffman* v. *United States* (1951) 341 U.S. 479 [95 L.Ed. 1118, 71 S.Ct. 814].)

It is not enough that the witness fears incrimination from answering the questions; the fear must be *reasonable* in light of the witness's specific circumstances, the content of the questions, and the setting in which the questions are asked. (*United States* v. *Jones* (10th Cir. 1983) 703 F.2d 473, 476.) In other words, the privilege protects only against "real dangers," and not "remote and speculative possibilities." (*Ibid.*)

■ It is the trial court's function to determine whether such a "real danger" exists. "[S]ome discretion must rest in the court whereby it may prevent the mantle of protection from being turned into a cloak for fraud and trickery." (*Coleman* v. *Galvin, supra,* 78 Cal.App.2d at p. 320.) If the court, in the exercise of its discretion, determines that no threat of self-incrimination is evident, then the burden of showing the danger of self-incrimination shifts to the individual asserting the privilege. (*Baker* v. *Limber, supra,* 647 F.2d at p. 917.)

In *Capitol Products Corporation* v. *Hernon* (8th Cir. 1972) 457 F.2d 541, a case analogous to this one, the plaintiff secured a $75,000 judgment, then initiated postjudgment discovery against the defendant. The defendant refused to answer 105 of the questions propounded to him, citing the Fifth Amendment privilege against self-incrimination. The federal district court permitted the defendant to invoke the privilege, but the Court of Appeals reversed and remanded with instructions to order the defendant to answer all the questions "unless a real danger of incrimination is specifically established with respect to each question." (457 F.2d at p. 544.) The court held that in evaluating a Fifth Amendment privilege claim, the trial court must determine whether the claimant is confronted by "substantial and real," and not merely "trifling or imaginary," hazards of incrimination. The court then concluded that: "In the present case, nothing either inherent in the questions or in the setting in which they were asked suggests that the defendant was confronted by a substantial and real hazard of incrimination. The questions themselves were innocuous. There was nothing to link the defendant with any criminal investigation or proceeding. The defendant has not alleged that the purpose of the examination was anything other than an ordinary search of his assets in order to satisfy the judgment against him. . . .

"On appeal, the defendant suggests that the disclosure of assets may, in some instances, lead to the discovery of evidence of violation of tax laws or laws relating to the acquisition and retention of property. But the defendant

has offered no evidence to show that this apprehension is anything other than imaginary. . . ." (457 F.2d at p. 543, citations omitted.)

██ Likewise, in this case, the questions put to Troy were those customarily asked at judgment debtor examinations. Their incriminating nature is not self-evident. It was therefore Troy's burden to show why any response on his part would pose a threat of self-incrimination. Troy did not meet that burden.

Troy's theory is that the revelation of any assets or personal information about himself could lead to an inquiry of how and when those assets were acquired, making that information a "link in the chain" of evidence which any number of prosecuting agencies might use to initiate a new criminal case against him.[3] Lurking in the background is a group of 80 potential "new" complaining witnesses (i.e., those not named in the previous indictment) who, frustrated at having uncollectible judgments against Troy, are "all the more likely to become actual complaining witnesses in a future criminal matter." As evidence of his status as an easy target for further prosecution, Troy points to the fact that he was investigated by United States Postal Inspectors even after he had been convicted and sentenced to federal prison.[4] Added to this is the fact that Troy is still on formal probation and is also subject to an injunction procured by the Securities and Exchange Commission in connection with his activities on behalf of PBL. A violation of either the probation or the injunction could earn Troy a swift return to federal prison.

Troy has amply demonstrated his fear of further prosecution, but that fear alone is not enough to invoke the Fifth Amendment privilege. The fear must be reasonable in light of the circumstances, the specific content of the questions, and the setting in which the questions are asked. (*United States v. Jones, supra,* 703 F.2d at p. 476.) In order to establish that his fear is reasonable, Troy must demonstrate some "nexus" between the information

---

[3]According to Troy, he conducted his activities not only within the realm of federal prosecutors, but also "in numerous counties within California (thereby involving numerous district attorneys' jurisdictions and the State Attorney General), as well as in numerous countries (Germany, Argentina, Saudi Arabia, Switzerland, and Belgium.)"

[4]That investigation was prompted by one of the victims named in the indictment, who mailed to the postal inspector involved in the PBL case an advertisement placed by PBL in the International Herald Tribune some three months after Troy and his associates were convicted. Based upon his investigation, including an undercover visit to PBL's offices by another inspector posing as a potential investor, the inspector concluded that "Mr. Nick Troy and Mr. Robert Koepple are involved in much the same type of scheme for which recently convicted."

requested and the risk of criminal prosecution and conviction. (*Martin-Trigona v. Gouletas* (7th Cir. 1980) 634 F.2d 354, 360.)[5]

At present, there is no criminal prosecution pending against Troy, and as far as anyone knows, there is not even an investigation which might lead to criminal prosecution. This is a civil proceeding in which a receiver, acting on behalf of a number of judgment creditors, is interested only in discovering assets which can be used to satisfy outstanding judgments. Were we to accept Troy's argument, as the respondent court aptly put it, "a defrauder who makes it big can always be cloaked and immune from a subsequent judgment debtor examination because there's always, quote, somebody out there who can come around and initiate a prosecution." Troy's fear of inadvertently providing information which might cause him to be preyed upon by various prosecutorial agencies is based upon pure speculation, and not the existence of the "real danger" which must exist for Troy to properly invoke the Fifth Amendment privilege.

2. *Marital Privilege.* ██ ██ Troy also interposed objections to approximately 20 questions about his present and former spouses and their assets, based upon the marital privileges set forth in Evidence Code sections 970 and 980.[6] The respondent court correctly concluded that neither privilege is applicable here. The privilege afforded by section 970 is inapplicable because Troy's spouse is not the one testifying. The privilege conferred by section 980 is likewise unavailable to Troy, since the information sought relates to the existence of assets, not to confidential communications between Mr. Troy and his spouse.

3. *Objections Based Upon Relevance.* ██ Troy also objected to a number of proposed questions designed to elicit information about his children. Troy alleges that such questions are irrelevant to a search for assets, and the only relevant inquiry in this area (which was not made) is whether Troy had transferred assets to his children. In fact, Troy was asked whether he had transferred property to *anyone* within the last 10 years, a query which, while posed in general terms, would presumably include Troy's children.

---

[5]In *Martin-Trigona,* the court held that even the pendency of criminal proceedings does not relieve a witness of his obligation to testify in a civil proceeding, unless he can demonstrate a "nexus" between the risk of conviction and the information requested.

[6]Section 970 provides: "Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding."

Section 980 provides, in pertinent part, that "a spouse . . ., whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

Equally relevant to the search for assets were questions relating to Troy's employment within the last five years, the birthplace of Troy and his spouse, names and addresses of Troy's partners, coshareholders, coofficers and codirectors, and the contents of Troy's will, which could reveal the existence and location of assets owned by Troy. While the relevance of some of the questions may seem remote, the purpose of a judgment debtor examination is to leave no stone unturned in the search for assets which might be used to satisfy the judgment. Because the questions were aimed at eliciting relevant evidence, the trial court properly directed Troy to answer them. (*Martin-Trigona* v. *Gouletas, supra,* 634 F.2d at p. 357.)

### CONCLUSION

The order to show cause is hereby discharged and the petition for writ of mandate, treated herein as a petition for writ of prohibition, is denied.

Hastings, J., and Eagleson, J., concurred.

Petitioner's application for review by the Supreme Court was denied January 29, 1987.